**SO ORDERED.**

**SIGNED this 05 day of January, 2011.**



_Dale L. Somers_
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

---

Opinion designated for on-line use and print publication
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In re:

**BROOKE CORPORATION, et el.,**

        **DEBTORS.**

**CASE NO. 08-22786**
**Jointly Administered**
**CHAPTER 7**

## MEMORANDUM OPINION AND ORDER GRANTING
## THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT
## ON THE ADMINISTRATIVE EXPENSE REQUEST OF
## THE BANK OF NEW YORK MELLON

The matter under advisement is the motion for summary judgment filed by Albert

A. Riederer, the Chapter 7 Trustee for Brooke Corporation, Brooke Capital Corporation,

and Brooke Investments, Inc. (hereafter collectively "the Debtors"), seeking judgment in

his favor on the Administrative Expense Request filed by the Bank of New York Mellon,

as Indenture Trustee (hereafter "BONY" and also at times referred to by the parties as

"BNY" and "BNYM").[1]  The Court has jurisdiction.[2]  The Court has carefully examined the briefs of the parties, reviewed the exhibits provided, and heard the oral arguments of counsel.  For the reasons stated below, the Court grants the motion for summary judgment, finding that there are no material facts in controversy and the uncontroverted facts establish that the prepetition activities of BONY for which it seeks compensation from the estates did not provide a substantial benefit to the estates, as required by applicable law.

**BACKGROUND FACTS.**

BONY has requested, pursuant to 11 U.S.C. § 503(b)(3)(D), to be paid as an administrative expense the attorney fees incurred prepetition by counsel for two securitization lenders, Bayerische Hypo-und Vereinsbank (hereafter "HVB") and Fifth Third Bank (hereafter "Fifth Third").  BONY is the Indenture Trustee for notes issued by Brooke Securitization Company 2006-1 ("the 2006-1 Notes"), held by HVB, which has become UniCredit Bank AG (hereafter "UniCredit"),[3] and for notes issued by Brooke Master Trust ("the 2007-A Notes"), held by Fifth Third.  The 2006-1 Notes and the 2007-

---

[1] Doc. 1027.

[2] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and § 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  Further this is a core proceeding which ths Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(A).  There is no objection to venue or jurisdiction over the parties.

[3] See Doc. 1384-14, p.1, stating "UniCredit Bank AG, New York Branch, a German corporation (formerly Bayerische Hypo-und Vereinsbank AG, New York Branch) has acquired the 2006-1 notes." For purposes of this opinion, no distinction shall made between UniCredit and HVB.

2

A Notes are collectively referred to herein as "the Notes."

Very generally, prepetition, the Debtors and related Brooke entities (hereafter collectively "the Brooke Entities") operated an insurance agency franchise business. The issuers of the Notes and Brooke-sponsored entities performing similar functions are referred to by the parties as "the Securitization Companies." The Brooke Entities loaned monies to their franchisees ("Brooke Franchise Agents"), primarily for the acquisition or growth of insurance brokerage businesses. Many of these loans were then "bundled" and sold to certain Securitization Companies or to other lenders, which then issued notes to investors, such as HVB, Fifth Third, and other banks. The notes were secured by the income and assets of the Brooke Franchise Agents. The parties refer to these transactions as "Securitizations." Under the governing documents, revenue flowing to the borrowers was required to be captured in certain trust accounts. In turn, those monies were supposed to be distributed through a "waterfall," a carefully structured procedure governing the distribution of revenue, so that, among other things, principal and interest would be repaid. At least by the summer of 2008, the Brooke Entities were not distributing the funds as agreed.

**FINDINGS OF FACT.**

**A. UNCONTROVERTED FACTS.**

The parties agree the following facts are uncontroverted.

In or about the summer of 2008, it became apparent to BONY and other creditors that the Debtors and some related companies were in significant financial distress, were

3

misappropriating and diverting funds, and had manipulated their accounting system to conceal such diversions and misappropriations. As a result, counsel for UniCredit and Fifth Third by late August began considering the possibility of bringing suit against certain of the Brooke Entities in order to bring them under the management of a receiver, and began drafting papers for such a suit. On or about September 3, 2008, representatives of the holders of the Notes, Textron Business Services, Inc. (the servicer for a number of the Securitization Companies), and other creditors met with representatives of the Debtors and some related Brooke companies in continued hopes of reaching a consensual resolution of the issues surrounding the Brooke Entities. Those efforts failed when it became apparent that the Brooke Entities were, and admitted to, continuing their diversions of money, and other serious issues came to light. At that point, UniCredit and Fifth Third determined that bringing an action to replace the Brooke Entities' management with a receiver was the best way to protect the assets of the Brooke Entities and achieve honest management of the Brooke Entities. Contemporaneously and in connection with the anticipated action, after considering several possible receivers, BONY selected Albert A. Riederer, a former judge and experienced insurance company liquidator, as its proposed receiver.

On September 11, 2008, BONY, in its capacity as Indenture Trustee for the Notes,[4] filed a Complaint in the United States District Court for the District of Kansas (Case No.

---

[4] BONY alleged that as of September 3, 2008, $35,858,800.77 in aggregate principal amount of 2006-1 Notes remained outstanding, and on the sale date, the outstanding aggregate principal amount of the 2007-A Notes was $139,946,744.93.

Case 08-22786    Doc# 1676    Filed 01/05/11    Page 4 of 34

08-CV-2424) against Aleritas Capital Corporation, Brooke Capital Corporation, Brooke Corporation, Brooke Capital Advisors, Inc., Brooke Agency Services Company LLC, and Robert D. Orr[5] (hereafter "Special Master Case"), alleging breach of contract, conversion and fraud, and seeking the prompt appointment of a receiver. In its Complaint, BONY made several factual allegations which are relevant to the present matter. The following paragraphs, retaining the Complaint's numbering, paraphrase the relevant allegations:

1.   This action arises from the Defendants' fraudulent conduct and misappropriation of millions of dollars pledged to note holders under certain securitizations (and due other lenders), and the spoliation of evidence to conceal these Defendants' actions.

2.   Instead of honoring the carefully structured procedures governing the distribution of revenue, the Defendants other than Robert D. Orr (hereafter the "Brooke Parties") have diverted the revenues designed to be deposited in trust accounts to themselves.

3.   The Brooke Parties have put in place a phony records system designed to keep at bay the servicer of the loans. The Brooke Parties recently have experienced the departure of key high level executives. Mismanagement, distrust, and dishonesty abound throughout the Brooke Parties.

46.  The Brooke Parties have altered their computer systems to conceal information concerning bank accounts to which monies are deposited in order to make it

---

[5] Debtor Brooke Investments, Inc., was not named as a defendant.

5

difficult to ascertain where monies received from insurance companies and others are deposited, enabling the Brooke Parties to deposit monies to accounts other than those required under their contracts with BONY, Textron, franchisees and others.

57. Brooke Capital continues to misappropriate, or direct the misappropriation of, funds comprising part of the collateral.

60. The failure of agencies caused by the Brooke Parties' defalcations is causing the loss of collateral for the Notes, a loss that increases every day the diversion of funds continues.

77. As a result of the defaults and misappropriation of funds alleged in the Complaint, BONY is in danger of suffering irreparable injury and is entitled to the appointment of a receiver forthwith to preserve and protect the business and operations of the Brooke Entities, and to maintain their value.

78(C) The diversion and dissipation of the funds specified in the Complaint, which constitute BONY's collateral for the benefit of Fifth Third and HVB, irreparably harms BONY in its capacity as Indenture Trustee under each of the Indentures, and Fifth Third and HVB as holders of the Notes.

78(D) No remedy other than a receivership can protect BONY's interest from further harm.

78(E) The appointment of a receiver will do more good than harm, in that the Brooke Parties' fraudulent conduct harms not only BONY, but the Brooke Parties' other creditors, and hundreds of insurance agencies who are Brooke franchisees.

6

Given the dire problems that had become apparent at the Brooke Entities, UniCredit and Fifth Third recognized at the time the Special Master Case was commenced that bankruptcy of some of the Brooke Entities, including the Debtors, was a substantial likelihood.

BONY simultaneously with the filing of the Complaint moved for the appointment of Mr. Riederer as Receiver. The Brooke Parties opposed the motion for a receiver, but instead moved for the appointment of a special master under Federal Rule of Civil Procedure 53. Debtors Brooke Corporation and Brooke Capital Corporation, as parties to the Special Master Case, agreed that the appointment of a special master was necessary, stating:

> Pending the final adjudication of this action, Defendants (and, really, all parties) need the intervention of a Special Master appointed by the Court to ensure that the flow of money from the pool franchise/borrowers is properly distributed to BCAP, BONY, TBS, Aleritas, Fifth Third, HVB, and the various franchise borrowers in accordance with the terms and requirements of the various securitization documents.

BONY opposed the Brooke Parties' motion. After intense negotiation under the auspices of the District Court, on September 17, 2008, the District Court of Kansas entered a Consent Order Appointing a Special Master ("Consent Order") wherein Mr. Riederer was appointed as Special Master for Brooke Corporation, Brooke Capital Corporation and Brooke Capital Advisors, Inc. (collectively "the Special Master Entities"). The Consent Order was jointly prepared and submitted to the Court by counsel for BONY and the

7

Defendants. The Consent Order granted the Special Master substantially the same powers as BONY had sought for a receiver.

In his capacity as Special Master, Mr. Riederer was given authority to direct the affairs of the Special Master Entities. Paragraph 5 of the Consent Order specifically directed that "[t]he Special Master will act on behalf of the Special Master Entities and their subsidiaries to implement the terms of the Securitization Documents," defined to include all documents relating to all Securitization Companies sponsored by the Brooke Entities, of which there were several in addition to the 2006-1 and 2007-A Securitizations with respect to which the Special Master Case was brought. BONY served as trustee for many or perhaps all of the Securitizations issued by the Securitization Companies. Relevant provisions of the Consent Order were based on the order entered in the *Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies v. Bayou Group, LLC,* No. 7:06-sv-02379-UA (Apr. 28, 2006).[6] The appointment of the Special Master had the intended effect of stopping the defalcations, and allowed the Special Master and creditors to understand whether or not the Brooke Parties could remain going concerns.

Both the Special Master and his counsel had regular and extensive contact with representatives and attorneys for BONY and lender banks involved in the Securitizations

---

[6] When moving for an award of administrative expenses, BONY relies primarily upon a 2010 opinion in the bankruptcy cases of the Bayou family of investment funds that awarded fees and expenses for prebankruptcy services to an unofficial committee of investors under § 503(b)(4). *In re Bayou Group, LLC*, 431 B.R. 549 (Bankr. S.D.N.Y. 2010).

8

in issue in the Special Master Case, including Fifth Third and HVB-UniCredit (collectively, "the BONY Banks"). During the period before the Debtors' bankruptcy cases were filed, there were many occasions where the BONY Banks' interests and the Special Master's interests coincided, and the BONY Banks' representatives and attorneys worked cooperatively and collaboratively with the Special Master and his attorneys because of such mutuality of interests. In contrast, there were other occasions where the interests of the BONY Banks and the Special Master were not mutual, and on those occasions the BONY Banks' representatives and attorneys disagreed with the Special Master and his attorneys, and attempted to influence the Special Master to change his plans or conduct.

After the appointment of the Special Master, representatives of BONY communicated regularly and frequently with the Special Master and professionals he engaged in order to aid his understanding of the Debtors' businesses and agreements, and to plan the operations and wind-down of the Debtors, allowing for orderly bankruptcy cases and preserving the assets of the Debtors' estates. Because the Brooke Entities were not capable of providing services to the Brooke Franchise Agents (such as acting as agent of record or providing the marketing and other services required under the franchise agreements), BONY worked with the Special Master to (among other things) secure the release of Brooke Franchise Agents in the Securitizations (who were also creditors of the Brooke Entities) so that the agents could find new agents of record (or become such) in order to continue in their business of selling insurance policies. The release of the agents

9

from their franchise agreements had no effect on the flow of commission payments under existing policies to and through the Brooke Entities. As the Special Master reported, most policy releases "will continue to have endorsement commissions flowing to Brooke for up to 12 months following the effective date of the release." It became apparent that the Brooke Entities could not continue to function and that filing Chapter 11 bankruptcy cases would be in the best interests of "the Debtors, their subsidiaries, their creditors and all parties in interest."

On October 28, 2008, Brooke Corporation and Brooke Capital Corporation filed their Chapter 11 petitions. Mr. Riederer was appointed as the Chapter 11 Trustee for both companies on October 29, 2008, and joint administration of the cases was ordered. As Debtors Brooke Corporation and Brooke Capital Corporation said in their application to appoint Mr. Riederer as their Chapter 11 Trustee:

> Debtors believe that the Special Master has provided needed oversight and stability to the Debtors' business operations and given confidence and trust to the creditors. Debtors believe it is essential to the preservation of the Debtors' assets that the knowledge and experience of the Special Master be combined with the enhanced powers and protections afforded debtors in bankruptcy by having the Special Master be appointed Chapter 11 Trustee for Debtors.

On November 3, 2008, Brooke Investments, Inc., filed its Chapter 11 petition, and likewise sought and obtained Mr. Riederer's appointment as its Chapter 11 Trustee. Joint administration with the other two Debtors' cases was also granted.

**B. FACTS WHICH THE COURT FINDS UNCONTROVERTED BECAUSE BONY'S ATTEMPTED CONTRAVENTION OF THE TRUSTEE' STATEMENTS**

10

**IS NOT EFFECTIVE.**

When moving for summary judgment, the Trustee provided the following additional statements of fact which BONY in its response identified as controverted. For the reasons stated in the footnotes to each paragraph, the Court finds that these facts are uncontroverted for purposes of the Trustee's motion for summary judgment.

During both the Pre-Petition Period (September 17, 2008, to October 28, 2008) and the Bankruptcy Period (October 20, 2008, to the present), all actions, conduct and statements by the BONY Banks' representatives and attorneys which were observed by both the Special Master and his counsel were consistent with actions taken for the sole benefit of the BONY Banks and their interests in the Debtors and assets owned or controlled by the Debtors.[7]

---

[7] BONY attempts to controvert this statement of fact by stating: "The Noteholders [HVB and Fifth Third] undertook substantial activities with respect to, among other things, Brooke Franchise Agents, and provided information to the Special Master concerning acts and assets of the Debtors." This is not a denial of the facts stated by the Trustee; it is consistent with the Trustee's statement, since the amounts owed by the Brooke Franchise Agents were collateral for the Notes.

BONY further attempts to controvert the Trustee's statement of fact by the following statement: "As the Trustee has acknowledged, these actions were intended to, and did benefit the estate and other creditors." BONY cites in support two paragraphs of a "first-day" emergency motion, filed in this Court (Doc. 24) jointly by the Trustee and three banks having interests in the Securitizations, to approve an agreed order permitting continuations of prepetition releases, powers of attorney, and other agreements between the Debtors and Brooke Franchise Agents. That motion, prepared by counsel for the BONY Banks, sought to cut off the payment of commissions to the Debtors, and direct that the commissions be paid directly to the BONY Banks. The paragraphs of Doc. 24 cited in support recite that the proposed order "seeks to preserve and protect the assets of the bankruptcy remote Securitization Companies" and to transfer servicing and other obligations to the movants "in order that the Securitization Companies and franchisee relationships may not be further disrupted." Doc. 24 does not support either the contention that the Trustee has acknowledged that BONY's actions were intended to and did benefit the estate, or the related contention that such actions did in fact benefit the estate and other creditors. Further, even if properly supported, the statement that the estate and creditors were benefitted does not controvert the Trustee's statement that BONY's actions were consistent with action taken for the sole benefit of the BONY Banks. BONY cites no activities undertaken which were not consistent with action taken for the benefit of the BONY Banks and their interests in the Debtors and assets controlled by the Debtors.

11

The BONY Banks' interests as expressed to Mr. Riederer and his counsel, and to the Court in the Special Master Case were to protect their position in the assets of the Debtors and funds controlled by the Debtors which were alleged to be collateral for the BONY Banks' secured loans to Brooke franchisees.[8]

The BONY Banks' interests were primarily focused on the cash flow stream of commission payments being made by various insurance companies to the Debtors and their affiliates in which the BONY Banks' claimed their security interests attached.[9]

One subject where the BONY Banks and the Special Master disagreed was whether the income stream collected by the Special Master should be immediately turned over to the BONY Banks or held by the Special Master until an allocation could be completed.  Understandably, out of self-interest, the BONY Banks wanted to get control of the money and that became the focal point of their activities, both in the Pre-Petition Period and the Bankruptcy Period.  During the Pre-Petition Period, the BONY Banks worked hard to have the Special Master terminate franchise agreements so that the BONY

---

[8] BONY attempts to controvert this statement by stating, "BNYM was interested in, among other things, the Debtors' provision [of] (or failure to provide) services to Brooke Franchise Agents."  This statement does not controvert the Trustee's statement.  Further, providing services to Brooke Franchise Agents is directly related to the commissions earned by the Agents, which commissions were the source of payments on the Notes.

BONY also states, "As the Trustee has acknowledged, these actions were intended to, and did benefit the estate and other creditors."  This statement is rejected as the basis for controverting the Trustee's statement for the reasons stated in the immediately preceding footnote.

[9] BONY's response to this statement is identical to its response to the immediately preceding statement and is rejected for the reasons stated in the immediately preceding footnote.

12

Banks could get the insurance companies to stop paying commissions to Brooke.[10]

Another subject of disagreement between the BONY Banks and the Special Master was whether the Brooke Parties should be put into bankruptcy. The Special Master first raised this issue with the BONY Banks in early October and the BONY Banks discouraged the filing of bankruptcy cases and remained opposed to the idea, but when the Special Master made it clear that he would file bankruptcies, the BONY Banks focused their attention on first-day motions designed to clarify the termination of franchise agreements so that insurance commissions would not be paid to the Debtors.[11]

---

[10] BONY states it denies this statement. It responds as follows:

 In fact, BNYM sought to have the Special Master fully comply with the terms of the Special Master Order, requiring full compliance with the terms of the Securitization Documents, and distribute funds accordingly, rather than maintain those funds under the control of Brooke Entities. With respect to franchise agreements, . . . BNYM and others, including Brooke Franchise Agents, sought termination of the franchise agreements so that the Brooke Franchise Agents could seek direct agent of record appointment with insurance carriers because the Brooke Entities were no longer providing services, including acting as agent of record for new policies, to the Brooke Franchise Agents. As the Trustee himself determined, terminating franchise agreements would have little or no effect on the payment of commissions through Brooke on then-existing policies.

The Court finds that BONY's first sentence does not controvert that of the Trustee, since the Securitization Documents provided for distributions to the BONY Banks. The evidence cited in support of sentence two is the emergency motion filed in this Court to approve prepetition releases, powers of attorney, and other agreements to terminate the franchise agreements (Doc. 24). Rather than controverting the Trustee's statement, this document supports the Trustee as it evidences BONY's interest in getting control of the money. The evidence cited in support of sentence three does not support the statement. In fact the Trustee's memo cited as supporting the last sentence, while not stating that termination would have little or no effect on the payment of commissions through the Brooke Entities on existing policies, does state: "Lenders are in the process of establishing direct contact with agent/borrowers, and we are helping to get that done. In order for *collateral value to be preserved*, agents will also need a relation to one or more carriers without Brooke in the middle." (Emphasis supplied.)

[11] BONY denies this statement, stating:

In fact, on October 8, 2008, the Special Master reported to Judge Lungstrum in the

After the Debtors filed for bankruptcy, the Special Master applied for compensation in the Special Master Case for himself and his professionals for the Pre-Petition Period. The BONY Banks objected to this fee request in large part because a portion of the fees were for services rendered in connection with the consideration of and planning for the filing of bankruptcy by the Debtors.[12]

---

District Court Action that Brooke was at a crossroads, whether to proceed with an orderly wind down or file a Chapter 11 bankruptcy. A wind down would mean releasing the Brooke Franchise Agents from their franchise agreements, working with them to make sure they had access to insurance carriers, and lining up the agents with the Securitization Companies and or banks holding their loans. He reported that he had spoken that day with about *fifty* banks via conference call, and that the banks preferred an orderly wind down. A wind down would require funding contributions from the banks. The Special Master further stated that a Chapter 11 filing would be "catastrophic" to the banks' collateral. UniCredit Bank, Fifth Third and other creditors did, in fact, provide funding contributions. In addition, the "first day motion[] designed to clarify the termination of franchise agreements" referenced in paragraph 12 was in fact a motion in which the Trustee, BNYM, UniCredit Bank, Fifth Third Bank and another bank, DZ Bank, joined. In that motion, the Trustee (along with the other parties) stated that "the proposed Agreed Order [with respect to franchise termination and other matters] is in the best interests of the Debtors' estates and their creditors." The Trustee further concurred that:

> The Agreed Order does not disturb the property owned by the Debtors' estates, as the disengagement of Insurance Agents from the Debtors' business allows relationships to continue which otherwise would collapse. In this sense the Agreed Order simply implements the terms of the Consent Order that the Debtors agreed to and seeks to preserve and protect the assets of the bankruptcy remote Securitization Companies. The Release of franchisees from their agreements and grant of Powers of Attorney [to certain Securitization Companies or Lenders] similarly furthers that purpose and disentangles certain of the Debtors (and affiliated non-Debtors) from the burdens of continued servicing and other obligations which they can no longer support.

Thus, "the Agreed Order simply reaffirms the course of business that the Movants have already agreed to."

The Court finds that BONY's statement does not controvert the substance of the Trustee's statement of fact as to the disagreement regarding filing for bankruptcy and the purpose of the first day order regarding franchise agreements.

[12] BONY denies this paragraph, and the following two paragraphs, stating:

The fee dispute – which was only over the proper source of payment for certain costs and

Case 08-22786    Doc# 1676    Filed 01/05/11    Page 14 of 34

In their objection, the BONY Banks argued that bankruptcy was not within the scope and purpose of the Special Master Case.[13]

Ultimately, this portion of the Special Master's attorney fees was never allowed in the Special Master Case and was never paid.[14]

## C.  CONTROVERTED STATEMENT OF FACT.

The Trustee states as an uncontroverted fact the following:

Neither Riederer [the Receiver-Trustee] nor Schmidt [counsel for the Receiver-Trustee] are aware of any action taken by the BONY Banks during the Pre-Petition Period [or] the Bankruptcy Period which provided a direct tangible benefit to the Debtors, their estates or their creditors (other than the BONY Banks) in this bankruptcy case.  Whatever indirect benefit, if any, which the Debtors or their estates may have received from the actions of the BONY Banks in the Pre-Petition Period would have been only incidental to the benefit intended and directed by the BONY Banks to

---

expenses claimed by the Special Master – had nothing to do with whether or not the appointment of the Special Master and BNYM's work with the Special Master constituted a substantial benefit to the Debtors' estate.  The basis for the objection was that the Special Master had already sought (and UniCredit Bank had provided) money for the purpose of preparing for bankruptcy.  Thus, the basis for the objection was that the Special Master was seeking payment for that [for] which he had already been paid.  In addition, BNYM objected because any additional costs for bankruptcy filings were properly ordinary business expenses of the Debtors, not matter chargeable by the Special Master.

The Court finds that BONY's statement does not controvert the Trustee's statement that BONY opposed the fee request because it included compensation for services related to the preparation for bankruptcy filings.  BONY's position as stated in its pleading opposing the Special Master's request was "the provision of bankruptcy advice to the Brooke companies so that they might file for bankruptcy is an expense of Brooke, not the Special Master."

[13] BONY denied this statement for the same reasons as the preceding statement.  This denial is rejected as a basis for controverting the Trustee's statement for the reasons stated in the immediately preceding footnote.

[14] BONY denied this statement for the same reasons as the two preceding statements.  This denial is rejected as a basis for controverting the Trustee's statement for the same reasons as those denials were rejected.

15

go to themselves.

BONY denies this statement on the basis that the appointment of Mr. Riederer as Special

Master was a benefit.  BONY states:

> In fact, the Debtors in the District Court Action admitted that the
> appointment of a Special Master was necessary.  Before this Court in this
> case, Debtors represented that the Special Master "*has provided needed
> oversight and stability to the Debtors' business operations* and *given
> confidence and trust to the creditors*" such that "Debtors believe *it is
> essential to the preservation of the Debtors' assets* that the knowledge and
> experience of the Special Master be combined with the enhanced powers
> and protections afforded debtors in bankruptcy by having the Special
> Master be appointed Chapter 11 Trustee for Debtors."

Whether the BONY Banks during the Pre-Petition Period engaged in activities

which were a substantial benefit to the administration of this case is the ultimate finding

to be made by the Court when ruling on the pending motion.  The Trustee's "statement of

uncontroverted fact" quoted above is merely a statement of the desired finding on this

issue and is not a proper subject for inclusion in the statements of fact submitted in

support of a motion for summary judgment.  Whether the activities in issue provided a

substantial benefit or only an indirect benefit is one of the issues before the Court.

## D.  FACTS ALLEGED BY BONY WHICH THE COURT WILL DISREGARD BECAUSE THEY ARE CONTRADICTED RATHER THAN SUPPORTED BY THE EVIDENCE CITED.

BONY asserts two statements of fact which are contradicted, rather than

supported, by the exhibits cited by BONY.  The Court will therefore disregard these

statements for purposes of the summary judgment motion.

First,  BONY states the following as an uncontroverted fact:  "[T]he Special

16

Master Order was drafted to give the Special Master the management of the Debtors, to file Debtors in bankruptcy and to allow him to continue as Chapter 11 Trustee of Debtors."[15]  Paragraph 7 of the Consent order is cited as support.  The Trustee responds, correctly, that the Consent Order provides that bankruptcy could not be filed without the approval of both the Special Master and the Debtors, and that the Special Master Order is silent as to the Special Master serving as a Chapter 11 trustee.

Second, BONY states the following as an uncontroverted fact:  "As anticipated in the Consent Order, Mr. Riederer was appointed Chapter 11 Trustee on October 29, 2008."[16]  The Trustee correctly controverts the first phrase of this statement, since there is nothing in the Consent Order anticipating that Mr. Riederer would be appointed Chapter 11 Trustee.

**BURDEN OF PROOF AND APPLICABLE SUMMARY JUDGMENT STANDARD.**

BONY, an indenture trustee, seeks compensation as administrative expenses for attorney fees and expenses incurred prepetition by two securitized lenders during the period beginning with the planning for the filing of the Complaint in the Special Master Case and ending with the filing of the Chapter 11 case on October 28, 2008.  BONY seeks the award pursuant to 11 U.S.C. § 503(b)(3)(D).[17]  It provides:

---

[15]  Doc. 1384, ¶ 15 (sentence 2).

[16]  *Id.* ¶ 21.

[17]  It could be argued that BONY seeks reimbursement under the wrong Code section.  Subsection 503(b)(3) specifically excludes compensation and reimbursement of a kind specified in § 503(b)(4),

17

(b)     After notice and a hearing, there shall be allowed
        administrative expenses, other than claims allowed under
        section 502(f) of this title, including —
        . . .
        (3)     the actual, necessary expenses, other than
                compensation and reimbursement specified in
                paragraph (4) of this subsection, incurred by —
                . . .
                (D)     a creditor, an indenture trustee, an
                        equity security holder, or a
                        committee representing creditors
                        or equity security holders other
                        than a committee appointed under
                        section 1102 of this title, in
                        making a substantial contribution
                        in a case under chapter 9 or 11 of
                        this title;

The Tenth Circuit held in *Lister*[18] that administrative expenses incurred prior to the

bankruptcy filing are compensable under this subsection if they provided a "substantial

contribution" to the bankruptcy estate.  BONY, as the party seeking compensation, has

the burden of proof to establish entitlement by a preponderance of the evidence.[19]

Summary judgment may be entered in favor of the Trustee, who does not have the

burden of proof, if BONY, as the party seeking the award, has insufficient evidence to

prevail as a matter of law.  The Trustee, as the moving party, bears the initial burden to

---

which provides for reasonable compensation for professional services rendered by an attorney of an entity
whose expenses are allowable under § 503(b)(3)(D).  However, since this issue has not been raised and
BONY's right to reimbursement under § 503(b)(3)(D) would be in issue if the motion were filed under
§ 503(b)(4), the Court will not consider the possibility that BONY is proceeding under the wrong Code
section.

[18] *Haskins v. United States (In re Lister)*, 846 F.2d 55, 57 (10th Cir. 1988).

[19] *Lister*, 846 F.2d at 57; *In re 9085 East Mineral Office Bldg., Ltd.*, 119 B.R. 246, 249 (Bankr. D.
Colo. 1990).

18

establish his "presumptive entitlement to summary judgment in the absence of an adequate response by the nonmovant."[20] "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."[21] "Once the movant has sustained this initial burden of production, the burden shifts to the nonmovant to show the court that there is in fact a genuine issue for trial"[22] and to "articulate a legal argument precluding summary judgment on the record before the court."[23]

## ANALYSIS AND CONCLUSIONS OF LAW.

### A.  THE MEANING OF "SUBSTANTIAL CONTRIBUTION".

The application of the foregoing standard for granting summary judgment requires a full understanding of the meaning of "substantial contribution" as used in § 503(b)(3)(D).  A number of courts,[24] including the Tenth Circuit,[25] have held that this

---

[20] 11 Jeffrey W. Stempel, *Moore's Federal Practice — Civil*, § 56.13[1] (3rd ed. 2010), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for the motion").

[21] *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2nd Cir.1995); *see Celotex Corp. v. Catrett*, 477 U.S. at 324-26.

[22] 11 *Moore's Federal Practice — Civil*, § 56.13[2], citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[23] *Id.* at § 56.13[4].

[24] *E.g., Lebron v. Mechem Fin., Inc.*, 27 F.3d 937, 944-45 (3d Cir. 1994); *In re Alert Holdings, Inc.*, 157 B.R. 753, 758 (Bankr. S.D.N.Y. 1993); *Bayou Group*, 431 B.R. at 549.

[25] *Lister*, 846 F.2d at 55.

19

subsection applies not only to postpetition activity but also to prepetition activity. The challenge to the courts is the definition of "making a substantial contribution in a case." Of course, an attorney for a creditor or indenture trustee must generally be paid by his or her client, not the estate. The substantial contribution standard for allowance of such fees as an administrative expense is a limited exception. When applying this exception, a balance is required "between the need to interpret the provisions of § 503 broadly enough to effectuate its goal of stimulating, encouraging and promoting meaningful creditor participation in reorganization proceedings and the need to keep administrative expenses to a minimum."[26] This Court agrees that "[t]he integrity of section 503(b) can be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."[27] The Fifth Circuit has said, "[S]ervices which substantially contribute to a case are those which foster and enhance, rather than retard or interrupt the progress of reorganization."[28] "Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."[29] Since creditors are presumed to act primarily for their own benefit, they

---

[26] Jeffrey A. Warren, *Substantial Contribution Claims: A New Perspective?*, 20 Am. Bankr. Inst. J. 10, 35 (2001).

[27] *Bayou Group*, 431 B.R. at 560, *quoting In re Best Prods. Co., Inc.,* 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994).

[28] *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir, 1986), quoted with favor in *In re Williams*, 49 Fed. Appx. 845, 850 (10th Cir. 2002) (*order and judgment not binding as precedent*).

[29] *Lebron*, 27 F.3d at 944.

20

face a particularly high hurdle in showing "substantial benefit."

The Tenth Circuit has stated the following as to the meaning of substantial contribution when a creditor seeks administrative expense status for prepetition activities:

> Administrative expenses incurred prior to the filing of a bankruptcy petition are compensable under 11 U.S.C. § 503(b)(3)(D), if those expenses are incurred in efforts which were intended to benefit, and which did directly benefit, the bankruptcy estate. Efforts undertaken by a creditor solely to further his own self-interest, however, will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate. Generally, creditors are presumed to act primarily in their own interest and not for the benefit of the estate as a whole.[30]

Under *Lister*, the elements to be considered are: (1) Whether the efforts were undertaken with the intent to benefit the bankruptcy estate; (2) whether the efforts directly benefitted the estate or whether the benefit to the estate was only incidental; and (3) whether the applicant has rebutted the presumption that it acted primarily for its own benefit rather than the estate as a whole. The three requirements are interrelated. The first requirement is the most difficult. This standard has been interpreted as placing emphasis on intent and excluding reimbursement under the subsection "if the creditor's actions were designed primarily to serve its own interests and would have been taken without any expectation of reimbursement from the estate."[31] This is not to say that the applicant's actions "must

---

[30] *Lister*, 846 F.2d at 57, citing *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557 , 565-69 (Bankr. D. Utah 1985) and *In re Automatic Spring Prods., Inc.*, 50 B.R. 6, 7 (Bankr. S.D. Fla.1985).

[31] 4 *Collier on Bankruptcy*, ¶ 503.10[5][a] (Alan N. Resnick & Henry J.Sommer eds.-in-chief, 16th ed. 2010), citing *Lebron*, 27 F.3d at 944.

21

have been based solely on altruism."[32]  A creditor with a primary purpose to benefit itself

and a secondary purpose of benefitting the estate may satisfy the intent requirement.[33]  As

stated by the Third Circuit, which quoted *Lister*, a creditor seeking reimbursement from

the estate for prepetition expenses for services which benefitted the estate "should be

presumed to be acting in his or her own interest unless the court is able to find that his or

her actions were *designed* to benefit others who would foreseeably be interested in the

estate."[34]

      The requirements that the benefit to the estate be direct rather than incidental and

that the applicant overcome the presumption that it acted for its own benefit are closely

related to the requirement that the actions were undertaken for the benefit of the estate.

As one court has said, "The term 'incidental,' in light of the facts in *Lister*, appears to

refer to any such accidental, inadvertent, or unintentional result."[35]  As to the

presumption, the Third Circuit has said, "Creditors are presumed to be acting in their own

interests until they satisfy the court that their efforts have transcended self-protection."[36]

## B.  POSITIONS OF THE PARTIES.

      The parties agree that the *Lister* standard controls BONY's request.  BONY

---

[32] *Amdura Nat'l Distrib. Co. v. Amdura Corp.*, 1995 U.S. Dist. LEXIS 21375, *6 (D.Ct. D. Colo. 1995), *aff'd* 105 F.3d 669 (10th Cir. 1997).

[33] *Id.*

[34] *Lebron*, 27 F.3d at 946 (emphasis supplied).

[35] *9085 E. Mineral Office Building*, 119 B.R. at 251.

[36] *Lebron*, 27 F.3d at 944.

submits that under this standard it made a substantial contribution,[37] while the Trustee submits that BONY's activities only incidentally benefitted the estate.

BONY relies primarily upon *Bayou Group*,[38] a 2010 decision of the Bankruptcy Court for the Southern District of New York, where the court found that an unofficial creditors committee's prepetition activities made a substantial contribution to the administration of the bankruptcy cases of the Bayou family of on-shore investment funds. A thorough review of that case is helpful. In the summer of 2005, it became clear that the Bayou family of on-shore and off-shore investment funds operated a Ponzi scheme. Although the funds' principals had been placed in federal custody and their assets subjected to seizure and forfeiture, the government did not seek a receiver for the entities. In January 2006, various Bayou investors determined to form an unofficial committee (hereafter "Committee") to represent the interests of investors, as a whole, in the on-shore funds. Forty-two investors with in excess of $109 million of unpaid investments responded to a notice. On February 7, 2006, six of the largest investors agreed to serve on the Committee, which would retain counsel to be paid pro rata based on the amount of

---

[37] However, BONY relies primarily upon *Bayou* Group, 431 B.R. 549. Although that decision cites *Lister*, it did not expressly apply the *Lister* standard for the award of administrative expenses for prepetition services. Rather it de-emphasized intent, focused upon the meaning of substantial contribution, and found a controlling consideration to be whether the movant's contribution was in place or instead of professionals who normally would be compensated out of the debtor's assets. *Id.*, at 562. The evidence of substantial contribution in *Bayou* is compelling. If that evidence had been evaluated under the *Lister* standard, this Court is convinced that the result would not have changed and administrative expenses would have been awarded.

[38] *Bayou Group,* 431 B.R. at 549. It is uncontroverted that when preparing the complaint in the Special Master Case, BONY relied upon the order appointing the receiver for the Bayou family of on-shore investment funds.

Case 08-22786    Doc# 1676    Filed 01/05/11    Page 23 of 34

the members' unpaid investments.  The bylaws of the Committee provided that its goal

was to "represent the interests of creditors holding unsecured claims against one or more

of the on-shore entities comprising the Bayou family of companies . . . by facilitating the

marshalling of assets of Debtor and prompt distribution to creditors."  The Committee

laid the ground work for what became Chapter 11 cases.  It performed the following

tasks:  Researched potential claims of the on-shore Bayou entities; searched for and

obtained the services of an individual to serve as a receiver, managing member, and

possible bankruptcy trustee of the on-shore Bayou entities; researched and prepared a

complaint for the appointment of a receiver; obtained the consent of a wide variety of

entities to the appointment of a receiver; shared its legal research about potential claims

with the receiver; and obtained and documented preliminary financing commitments that

served as the basis of debtor-in-possession financing once the on-shore entities sought

bankruptcy relief.  The Committee commenced a suit and filed a motion to appoint a

receiver on March 26, 2006, and an order appointing the receiver was filed on April 28,

2006.  It provided that the receiver's duties would include, in his capacity as sole

managing member of the on-shore entities, petitioning to commence cases under Title 11

and serving as the debtor-in-possession in cases under Chapter 11.  Chapter 11 cases were

commenced by the receiver on May 30, 2006.  The Committee sought an award of fees

and expenses of counsel to the Committee for pre-bankruptcy services as an

administrative expense under § 503(b)(4), which allows compensation for professional

services rendered by an attorney for an entity whose expense is allowed under

24

§ 503(b)(3)(D). The United States Trustee and some creditors objected.

The bankruptcy court found that the Committee's activities had substantially benefitted the cases. The Committee's substantial contribution was one that debtor-compensated professionals should have made but did not. First, the Committee aimed to file and organize the Chapter 11 cases. Second, the Committee represented the interests of creditors of the Bayou on-shore funds as a whole. The speed with which the bankruptcies were filed reduced the risk that potential assets subject to recovery would be dissipated and evidence would become stale. The Committee lined up debtor-in-possession financing. The United States Trustee's argument that the Committee should not be compensated for services in filing the receivership rather than involuntary bankruptcy cases was rejected because the orderly process resulting from the receivership substantially benefitted the estate. Finally, the court noted that the Committee's legal research as to potential claims was clearly undertaken with an eye toward bankruptcy and that complaints to avoid prepetition redemptions were filed almost simultaneously with the bankruptcy filing, resulting in settlements and recoveries which comprised most of the assets of the estate and funded the confirmed plan.

In the cases before this Court, on the other hand, the Trustee submits that administrative expense compensation is not warranted because the BONY Banks' activities did not provide a substantial benefit to the cases. The Trustee relies upon the

25

Tenth Circuit's *Lister*[39] opinion, where administrative expense status was denied as to prepetition activities. A thorough review of *Lister* is also helpful here.

In January of 1980, a man named Haskins obtained a judgment against the Listers in federal court in the amount of $440,000, plus interest and attorney fees. He began efforts to collect the judgment. After gathering information about the Listers' assets, he obtained an injunction prohibiting their transfer, and commenced garnishment and attachment proceedings against the Listers' property. The Listers filed for relief under Chapter 11 in November of 1980. In October of 1985, Haskins filed an application for administrative expenses pursuant to § 503(b)(3)(D) for $326,000 relating to prepetition and postpetition efforts. The bankruptcy court denied the application, the district court affirmed, and the Tenth Circuit also affirmed. The Tenth Circuit found that the efforts of Haskins were undertaken "solely for the purpose of collecting his judgment" and "could not have been undertaken in anticipation of the reorganization of the debtors, as he was unaware of the pendency of the bankruptcy proceedings until after the petition was filed."[40] Any benefit to the estate in identifying and preventing the dissipation of assets was found to be "only incidental"[41] so that expenses incurred prepetition were not compensable under § 503(b)(3)(D). The Trustee argues that the facts of these cases are similar to *Lister*.

---

[39] *Lister*, 846 F.2d at 55.

[40] *Id.* at 57.

[41] *Id.*

Case 08-22786   Doc# 1676   Filed 01/05/11   Page 26 of 34

The Court agrees with the Trustee that under the facts of these cases and the standard of *Lister*, BONY is not entitled to an award of administrative expenses for prepetition attorney fees and expenses. These cases and *Bayou* are similar as to the prepetition procedures undertaken by the movant. In both situations, there was a prepetition federal court action which preserved the status quo and resulted in the appointment of a receiver or special master who later served as the representative of the Chapter 11 estates after the bankruptcy cases were filed. However, the "substantial contribution" standard as applied to a request for compensation of prepetition expenses does not focus on prepetition procedures. The fact that the movant argues that but for the prepetition actions, the Chapter 11 case might not have been filed or a particular person might not have been appointed to represent the Chapter 11 estate is not sufficient.[42] The presence or absence of a substantial contribution focuses on the activities of the applicant and their benefit to the estate, using the three factors identified in *Lister*. The Court therefore examines those factors.

The first *Lister* factor is whether the expenses were incurred in efforts which were intended to benefit the bankruptcy estate. When the expenses relate to prepetition events, this element is difficult to prove since the estate was not in existence when the activities

---

[42] *Lister*, 846 F.2d at 57. *See also Bayou Group*, 431 B.R. at 563, citing *Lister* and *Lebron*, 27 F.3d at 946, in support of the proposition that "if the movant argues merely that, but for some action that it took prepetition, the chapter 11 case would not have been filed or steps would not ultimately have been taken to recover or marshal the debtor's assets for creditors, the creditor would have a heavy burden to show that it made a 'substantial contribution in the case,' as opposed to having merely pursued its rights as a creditor."

27

were undertaken. The question becomes whether the activities were undertaken with the intent to promote a future bankruptcy. The Trustee has presented uncontroverted facts evidencing that the activities were not intended to promote a future bankruptcy. BONY has not shown that there are any material facts in controversy in this regard. The uncontroverted facts establish that when the Special Master Case was filed, UniCredit and Fifth Third "recognized" that bankruptcy of the Brooke entities, including the Debtors, was a "substantial likelihood." After the filing of the Special Master Case, this likelihood materialized. However, the uncontroverted facts do not evidence that the actions of the BONY Banks facilitated the filing. Rather, the BONY Banks disagreed with the Special Master about the filings under Title 11. When the Special Master first raised the issue with the BONY Banks in early October, the Banks discouraged the filings and remained opposed to the idea. The Consent Order, negotiated by BONY, appointing the Special Master and defining his powers and duties did not empower him to file under Title 11; consent of the Debtors and the Special Master was required. When the Special Master made it clear that bankruptcy relief would be sought, the BONY Banks focused their attention on first-day motions designed to clarify the termination of franchise agreements so that insurance commissions would not be paid to the Debtors, an action which would benefit the Banks, not the bankruptcy estates.

After the Debtors filed for relief, the Special Master applied for compensation in the Special Master Case for himself and his professionals for the Pre-Petition Period. BONY opposed the motion in large part because the fees were for services rendered in

connection with the consideration of and planning for the filing of bankruptcy by the Debtors. It is uncontroverted that BONY, as part of its argument opposing compensation, asserted that bankruptcy was not within the scope of the Special Master Case. When seeking administrative expense status for the BONY Banks' fees, BONY argues that the foregoing facts are irrelevant because all it opposed was the payment for those services by securitization holders, when in its view, the Brooke Entities should have borne that cost. The Court finds the significant matter to be the assertion that bankruptcy planning was not within the scope of the Special Master Case, which is different from an argument about the source of funding. Since all of the expenses for which the BONY Banks seek compensation were undertaken in conjunction with the planning for and litigation of the Special Master Case, it is hard for the Court to comprehend how the activities of BONY could have been taken with the intent to promote a future bankruptcy when bankruptcy was not within the scope of the Special Master Case.

The Trustee has pointed to an absence of evidence to support BONY's burden of proof to show that the activities for which it seeks compensation were undertaken with the intent to benefit the bankruptcy case. BONY has not shown a genuine issue for trial as to the first element of the *Lister* standard.

The second *Lister* element is whether the efforts directly benefitted the estate or whether the benefit to the estate was only incidental to efforts undertaken by the BONY Banks for their own self interest. The primary benefit to the estate on which BONY relies is the appointment of Mr. Riederer as the Chapter 11 Trustee immediately after the filing

of these cases. There is no doubt that his appointment was beneficial to the estates and the cases; the question is whether that benefit was incidental or direct. The Court finds that it was incidental.

BONY was the moving force in identifying Mr. Riederer as a qualified person to manage the Brooke Parties and obtaining his appointment as Special Master in the Special Master Case. When filing the Special Master Case and obtaining the appointment of the Special Master, BONY was acting to stop the diversion of funds which should have been, but were not being, applied to the securitization contracts, to stop the loss of collateral for the Notes, and to achieve honest management of the Brooke Entities. The Complaint alleged that the Special Master Case was filed to protect BONY's interests from further harm. Mr. Riederer was not granted authority to place the Brooke Parties in bankruptcy, the Consent Order did not provide that he would serve as a Chapter 11 trustee if Chapter 11 cases were filed, and, according to BONY, preparing for bankruptcy was not within the scope of Mr. Riederer's duties in the Special Master Case. The Court therefore cannot conclude that either the filing for relief under Chapter 11 or Mr. Riederer's appointment as the Chapter 11 Trustee was a direct result of BONY'S activities. These events were the incidental results of the filing of the Special Master Case, and the selection and appointment of Mr. Riederer as Special Master, actions which were taken by BONY as indenture trustee to protect the interests of Fifth Third and HVB as holders of the 2007-A Notes and the 2006-1 Notes.

BONY also asserts that it directly aided the administration of the bankruptcy cases

30

by assisting the Special Master in "getting up to speed." Again, it is uncontroverted that such assistance was given and that it benefitted the estates to have the immediate appointment of a trustee familiar with the Brooke businesses. But again, the question is whether this benefit was direct or incidental. In its statement of facts, BONY identifies no assistance given to the Trustee which was not consistent with BONY's primary goal of protecting the investments of the securitization holders, and has not shown that there is a controverted issue of fact in this regard.

BONY in its statement of facts and arguments places significant emphasis upon its efforts initiated in the Special Master Case and continuing in this case to release the Brooke Franchise Agents from their arrangements with the Brooke Entities. During the Special Master Case, the BONY Banks were particularly concerned with the cash-flow stream of commission payments being made by various insurance companies to the Debtors and their affiliates, in which the BONY Banks claimed a security interest. The BONY Banks worked with the Special Master to terminate the franchise agreements so that the BONY Banks could get the insurance companies to stop paying commissions to any of the Brooke Entities. At least initially, the Special Master and the BONY Banks disagreed whether the income stream should be collected by the Special Master until an allocation could be completed, or whether, as urged by BONY, the BONY Banks should get immediate control of the funds. When the bankruptcy cases were filed, Mr. Riederer and three banks filed a joint motion to approve an agreed order permitting the continuation of prepetition releases, powers of attorney, and other agreements between

31

the Brooke Parties and the Brooke Franchise Agents. BONY fails to explain how these efforts benefitted the estates as a whole, rather than just the BONY Banks and other securitization holders. Nevertheless, assuming that these activities provided benefits to entities other than the BONY Banks, such as other holders of securitized Brooke notes and the Brooke Franchise Agents, the question is whether those benefits were incidental or direct. Again the Court concludes that they were incidental. It is uncontroverted that the BONY Banks filed the Special Master Case to protect their positions in assets of the Brooke Parties, and that the termination of franchise agreements was one method undertaken to achieve that goal.

The Trustee has pointed to an absence of evidence to support BONY's burden of proof to show that the activities for which it seeks compensation directly benefitted the bankruptcy estate. BONY has not shown a genuine issue for trial as to the second element of the *Lister* standard.

The incidental rather than direct benefit of the prepetition actions in this case is illuminated when contrasted with the prepetition actions in *Bayou* which were found to have made a substantial contribution to the subsequent bankruptcy case. In *Bayou*, the prepetition receiver alone had authority to place the *Bayou* entities in Chapter 11 cases, and the Committee supported filing when the receivership case was in the proper posture. In these cases, pursuant to the Consent Decree negotiated by BONY, the Special Master could not act alone but needed the consent of the Debtors to file for bankruptcy relief, and BONY opposed the Special Master's decision that bankruptcy was appropriate. In

32

*Bayou*, the Committee expressly took upon itself the representation of all the debtors' creditors. In these cases, BONY represented only two of the banks who held Brooke Securitizations. In *Bayou*, but not in these cases, the applicant made arrangements for debtor-in-possession financing. In *Bayou*, but not in these cases, the applicant undertook research of bankruptcy causes of action to recover assets for the estate and shared those results with the receiver-debtor-in-possession, allowing the prompt filing of recovery actions before the assets became unavailable. In these cases, the uncontroverted facts establish that representatives of BONY communicated regularly with the Special Master and the professionals he engaged to aid his understanding of the Debtors' businesses, and to plan the operation and wind-down of the Debtors. Although there is no controversy that these actions allowed for orderly bankruptcy cases and preserved the Debtors' assets, there are no facts indicating that this contribution was direct or significant.

These cases are more like *Lister*, where the creditor was not entitled to an administrative expense claim for prepetition services. The creditor, as a result of acting to facilitate collection of his judgment, preserved the assets of the estate. In *Lister*, as in these cases, the estate benefitted, but the benefit was an incidental result of actions taken primarily to benefit the creditor.

Further, BONY has not satisfied the third *Lister* element, which is closely related to the first two; it has not rebutted the presumption that it acted primarily for its own benefit rather than for the estates as a whole. Indeed, the Court observes that secured creditors, who have interests in specific assets of an estate, have an inherent conflict with

33

unsecured creditors, who have an interest in augmenting the unencumbered assets of the estate. This makes it especially difficult for secured creditors to overcome the presumption that they acted primarily for their own benefit. In this case, the Court is not satisfied that the efforts of BONY transcended protection of the BONY Banks. The uncontroverted facts establish that all actions of BONY in the Special Master Case were consistent with actions taken for the sole benefit of the BONY Banks and their interests in the Debtors and assets owned or controlled by the Debtors. BONY has not shown that there is a material fact in controversy as to its motivation.

**CONCLUSION.**

For the foregoing reasons, the Court grants the Trustee's Motion for Summary Judgment on the Administrative Expense Request of the Bank of New York Mellon. There are no material facts in controversy, and the Trustee is entitled to judgment as a matter of law.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure, which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**Judgment is hereby entered denying the Administrative Expense Request of The Bank of New York Mellon.[43]**

**IT IS SO ORDERED.**

# # #

---

[43] Doc. 1027.

Case 08-22786    Doc# 1676    Filed 01/05/11    Page 34 of 34